# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RONNIE L. FAMOUS,

                    Plaintiff,

v.                                                          Case No. 20-CV-510-JPS

JOSEPH JEZWINSKI, CARLO
GAANAN, LOYDA LORIA, and                          **ORDER**
MELISSA MITCHELL,

                    Defendants.

Plaintiff Ronnie L. Famous ("Plaintiff"), an inmate confined at the Wisconsin Resource Center ("WRC"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that various defendants violated his constitutional rights. ECF No. 1. On December 3, 2020, the Court screened Plaintiff's complaint and allowed it to proceed on the following three claims: (1) deliberate indifference to Plaintiff's serious medical needs, risk of self-harm and/or suicide, in violation of the Eighth Amendment, against Defendant Joseph Jezwinski ("Jezwinski"); (2) deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment, against Dr. Carlo Gaanan ("Gaanan"), Dr. Loyda Loria ("Loria"), and Melissa Mitchell ("Mitchell"); and (3) negligence, pursuant to Wisconsin state law, against all defendants. ECF No. 8 at 8. The Court previously recruited counsel for Plaintiff, ECF No. 21; however, counsel later had to resign. ECF No. 40. Despite the Court's best efforts, it was unable to locate new pro bono counsel to take Plaintiff's case, and the Court therefore set new deadlines for the case to proceed without counsel. ECF No. 44.

Now pending before the Court is Defendants' motion for summary judgment seeking dismissal of all federal claims. ECF No. 47. The motion is now fully briefed and ready for disposition. ECF Nos. 48, 61, 66. For the reasons described in detail below, the Court will grant Defendants' motion as to the federal claims, will decline to exercise supplemental jurisdiction over the state-law negligence claim, and will dismiss this action accordingly.

## 1. LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 2. FACTUAL BACKGROUND

Along with their motion, Defendants submitted proposed findings of fact. ECF No. 49. Plaintiff responded to those facts and additionally provided his own proposed facts. ECF Nos. 62, 63. Defendants responded

to Plaintiff's proposed facts. ECF No. 67. Defendants acknowledge that various facts are disputed; however, they argue that summary judgment is nonetheless still appropriate because they are entitled to judgment as a matter of law on Plaintiff's version of the facts. As such, the Court takes the following facts from the parties' proposed statements of fact and includes any disputed facts in the light most favorable to Plaintiff as the non-moving party.

### 2.1 The Parties

Plaintiff was housed at the WRC during the times relevant to this case. Defendants Gaanan and Loria were employed by the Department of Health Services at the WRC. Defendant Mitchell was employed as a Nursing Supervisor by the Department of Health Services at the WRC. Defendant Jezwinski was employed as a Psychiatric Care Technician at the WRC.

### 2.2 Psychiatric Care Technician Joseph Jezwinski

On December 24, 2019, after receiving many bad meals that made Plaintiff sick, Plaintiff asked Jezwinski to inform the Personal Care Supervisor ("PCS") or psychological service unit ("PSU") that Plaintiff needed to speak with them because he was going to harm himself. Jezwinski refused to inform or call the PCS and PSU staff about the emergency. According to Jezwinski's schedule, he was working on December 24, 2019; however, he does do not recall Plaintiff requesting to speak with the PCS/PSU or that Plaintiff was going to harm himself. Plaintiff was housed in the F-11 Segregation Unit on that day.

If Plaintiff had told Jezwinski he was experiencing an emergency, Jezwinski would have contacted the PCS on shift who would then have

contacted the captain on shift who would then have contacted the on-call psychologist as it was a holiday. This would also be noted on the Census Logbook. Plaintiff maintains he told Jezwinski he was going to harm himself and covered his window. Jezwinski told Plaintiff to go ahead and walked away from Plaintiff's cell. Plaintiff then began to karate chop the steel desk in his cell and seriously injured his finger on his left hand to the point that it was disfigured, deformed, and hurt constantly.[1] Jezwinski came back to Plaintiff's cell four different times while Plaintiff karate chopped his desk and said "take the paper down," at which time Plaintiff told Jezwinski he needed to see the nurse because he hurt his hand hitting the desk. Jezwinski did not call the nurse.

According to the Census Logbook, at 6:16 a.m., Jezwinski noted that Plaintiff had covered his window and said that staff had messed with his food. Jezwinski did not note that Plaintiff was making any threats of self-harm. Because Plaintiff had his window covered, Jezwinski would not be able to see inside his cell and would not be able to see what Plaintiff was doing. If Plaintiff refused to uncover his window, other staff members would eventually need to be called to attempt to get Plaintiff to uncover his window. If he continued to refuse to comply, staff would need to enter the cell through a planned use of force, which would take several minutes to assemble a team. Plaintiff agrees that he refused to uncover his window but maintains that Jezwinski should have called someone about the situation.

_____

[1]Defendants object that Plaintiff failed to supply medical records to support the extent of his injury. ECF No. 67 at 3. The Court interprets Plaintiff's fact as permissible, however, to the extent that the opinion was rationally based on Plaintiff's perception. *See* Fed. R. Evid. 701(a).

Jezwinski had no information from Plaintiff that he had any item, such as a razor or other instrument, that he could use to harm himself. Jezwinski does not recall being aware of any prior incidents where Plaintiff had harmed himself. Jezwinski also does not recall any specific prior incident where Plaintiff intentionally injured himself by striking an object. If Jezwinski had seen Plaintiff karate chopping his desk, he could not have entered his cell alone to stop him because of security concerns. Jezwinski would have contacted the PCS and then waited at Plaintiff's cell for additional staff to arrive. Jezwinski could not have entered Plaintiff's cell until other officers arrived to assist him.

### 2.3    Dr. Carlo Gaanan

Plaintiff was transferred to WRC on December 10, 2019, for psychiatric stabilization. On December 24, 2019, Plaintiff had to wait until RN Spiegel made her medication rounds to inform her about his hand injury. Spiegl saw Plaintiff at approximately 8:00 a.m. for his injury. Spiegel conferred with Dr. Chona Arong for treatment. Dr. Arong ordered an X-ray of Plaintiff's right hand.[2] At approximately 10:33 a.m., the X-ray order was discontinued and Dr. Arong created a new X-ray order for Plaintiff's left hand. At WRC, a patient's primary provider is a psychiatrist who specializes in mental health so after the initial order for an X-ray, Dr. Arong

---

[2]Plaintiff notes he does not have information to determine the truth of this statement because he was unable to conduct discovery. ECF No. 62 at 6. The Court notes that it previously denied Plaintiff's motion to conduct discovery, without prejudice, for the failure to meet and confer with Defendants on the issue. ECF No. 58. The Court then granted Plaintiff additional time to respond to Defendants' motion for summary judgment. ECF No. 60. Plaintiff did not renew his request for discovery during this time period.

referred Plaintiff to the Health Service Unit ("HSU") to be assessed and evaluated.

Gaanan saw Plaintiff on December 24, 2019, at approximately 11:10 a.m., for an evaluation and assessment. Ganan is not an orthopedic specialist. While awaiting the X-ray result, Gaanan ordered to have the left pinky "buddy taped" to the ring finger to act as a splint for one week for stabilization and to help with healing. Gaanan ordered Ibuprofen at 600 mg three times a day as needed for pain management for six weeks. Plaintiff's X-ray showed there was no acute fracture, dislocation, or destructive bony process but there was mild soft tissue swelling around the fifth finger. Plaintiff believes this not to be true because his January 2021 X-ray showed a "radial deformity left small DIP with degen changes." *See* ECF No. 62 at 7.

After the X-ray result on December 26, 2019, Gaanan determined that the "buddy taping" and providing Ibuprofen was the appropriate management at that time. Plaintiff maintains that Gaanan's plan was inadequate because he required an actual splint and the Ibuprofen upset his stomach and did not stop the pain. Gaanan believed conservative treatment was appropriate because the X-ray did not reveal any dislocation, fracture or destructive bony process. In addition, the soft tissue swelling on the X-ray was interpreted as mild. Plaintiff maintains conservative treatment was not appropriate. Gaanan did not make a note of this in the Prescriber's Order, but he would have told Plaintiff to submit a Health Service Request ("HSR") to the HSU if the condition was not improving or getting worse.

The parties dispute whether Gaanan told Plaintiff that someone would be following up with him. For the purposes of summary judgment,

the Court therefore assumes Gaanan told Plaintiff that someone would follow up with him. Gaanan had no further interaction with Plaintiff regarding his left pinky finger. Plaintiff maintains that he sent Gaanan HSR's on March 26, 2020 and April 2, 2020 to increase his pain medication; however, nothing in the record indicates Gaanan was ever aware of these requests.

### 2.4 Dr. Loyda Loria

Loria was not Plaintiff's primary provider at WRC, and she is not an orthopedic specialist. Psychiatric Nurse Practitioner Deanna Kapitzke was his assigned primary provider. At WRC, patients are admitted from the Department of Corrections for treatment for their psychiatric disorders. The attending primary provider is the psychiatrist or psychiatric nurse practitioner. Loria is one of the medical consultants for primary care. Rather than seeing patients regularly, Loria only sees patients at WRC if they are referred by their psychiatric care provider for medical/physical complaints.

On January 30, 2020, Plaintiff was referred to Loria for left hand fifth finger ("pinky") pain. Plaintiff complained he hit his left hand on a steel table when he was upset and since then it had been hurting. Plaintiff denied any recurrent injury. The parties dispute whether Plaintiff told Loria that the Ibuprofen helped his pain. As such, the Court assumes Plaintiff's version of the facts and that Plaintiff told Loria that the Ibuprofen did not stop the pain completely.

The parties dispute whether Loria showed Plaintiff the X-ray; Plaintiff maintains Loria only showed him a "picture of tendons from her computer." Defendants maintain the X-ray showed no osseous abnormality or fracture but there was mild soft tissue swelling. Plaintiff maintains the

X-ray did not show this because the January 2021 X-ray showed a radial deformity. Loria noted there was mild flexion deformity in the left proximal interphalangeal joint ("PIP") but there was no swelling or redness, and Plaintiff had limited flexion because of pain. Plaintiff had a tendon injury, so Loria advised Plaintiff to continue with splinting and gentle exercise of his pinky finger and to continue to take Ibuprofen, 400 mg up to four times a day as needed for pain. Loria believed conservative treatment was appropriate because there was no fracture or malalignment noted in the X-ray; Plaintiff maintains conservative treatment was inadequate. Plaintiff maintains that Loria told Plaintiff she would not refer him to a hand surgeon because he had four other "good fingers", and "they" did not operate on pinky fingers.

On July 13, 2020, Loria saw Plaintiff for a follow-up appointment for his left pinky injury. Plaintiff explained again that he hit his left hand on a steel table when he was upset and since then had not been able to completely flex or extend his pinky finger. Plaintiff complained of pain and tenderness and stated that he was taking Tylenol at least twice a day. Loria again reviewed the December 24, 2019 X-ray of Plaintiff's pinky finger and the image showed no osseous abnormality but there was mild soft tissue swelling. There was mild flexion deformity in the left PIP joint, and Plaintiff was unable to completely extend or flex his pinky finger left fifth digit. Plaintiff, in his own words, describes the deformity as severe. During this visit, Loria again did not prescribe additional pain medication because Plaintiff told her he was already taking Tylenol twice a day. Plaintiff maintains he told Loria that the Tylenol did not stop the pain completely. Loria referred Plaintiff to the hand surgeon for further evaluation and

treatment during this visit; however, Loria informed Plaintiff that he may have an extended waiting period due to the COVID pandemic and because Plaintiff's injury was not an emergent situation. Plaintiff believes Loria did not actually refer him to the hand surgeon; Plaintiff's medical records show a handwritten note indicating a referral to a hand surgeon in July 2020. ECF No. 68-1. Appointment requests for offsite medical care, including specialists, are scheduled by the Medical Program Associate Assistant ("MPAAs"). Based on community standards and the on-going pandemic, it was not uncommon to wait three to eight months for appointments with specialists such as orthopedic surgeons and ENTs.

On July 29, and August 12, 2020, Plaintiff was scheduled to see Loria for follow-up of his blood pressure and cholesterol but refused to see her. Plaintiff additionally refused blood work on June 26, 2020, July 24, 2020, and August 5, 2020. He was on two medications for blood pressure and a medication for his cholesterol. Blood pressure and cholesterol should be monitored periodically to ensure control. Loria noted she would not reschedule him due to his repeated refusals but recommended to his psychiatric provider to refer him back when he agreed to have lab work and to attend his scheduled appointment. Bloodwork is essential because high blood pressure can negatively affect the kidneys, and his cholesterol needed to be checked to see if the medications were working properly. The blood tests were also needed to check the side effects of the medication on his kidneys, liver, and electrolytes. Plaintiff needed to be seen again to check his blood pressure and discuss the results. Loria had no further interactions with Plaintiff after July 13, 2020.

On August 27, 2020, Plaintiff was transferred from WRC to Columbia Correctional Institution ("CCI"). Loria was not aware of the scheduled transfer. Plaintiff's WRC psychiatric provider, Deanna Kapitzke, would have collaborated with nursing staff to prepare a discharge summary for his new CCI provider to review. At WRC, residents are instructed to submit an HSR so it can be triaged by a registered nurse for medical care. If nursing identifies a concern, a referral to the resident's primary psychiatric provider will occur and they will decide if referral to a medical consultant is needed. Registered nurses will also review a new inmate's medical record for any ongoing or emergent issues that need to be referred to their provider. This includes referrals.

Once Plaintiff was transferred to CCI, he was no longer under the care of WRC and his care was transferred to DOC and CCI. As a result, Loria's referral to the hand surgeon was no longer valid because he was no longer under the care of WRC. Loria was not Plaintiff's WRC psychiatric provider. It was not her role or responsibility to contact Plaintiff's new CCI primary provider to discuss his care once he transferred to CCI. Loria was not informed that Plaintiff transferred to CCI.

### 2.5 Nursing Supervisor Melissa Mitchell

Mitchell never saw Plaintiff in relation to his pinky finger injury. As a Nursing Supervisor, Mitchell generally does not evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care contact with patients. Mitchell also does not have control over the schedules of providers or outside specialists. HSRs are triaged daily by nurses in the HSU. As a Nursing Supervisor, Mitchell rarely triaged HSRs herself unless her assistance was required. Plaintiff directed

his January 29, 2020 HSR to the "HSU Manager." Mitchell reviewed the HSRs Plaintiff submitted about his left pinky finger. Mitchell had no personal involvement with responding to them. Plaintiff points to the fact that no nurse signed the response to signal that Mitchell must have been involved.

As a Nursing Supervisor, Mitchell has managerial authority over the functions of the HSU at WRC, as well as over the nurses working in the HSU, but she has no authority to supervise doctors with respect to their medical decisions. Mitchell has no authority to intervene or overrule doctors' medical decisions. Even if Mitchell had such authority, she was not aware of any potentially inappropriate medical decisions by Loria or Gaanan regarding their care and treatment for Plaintiff's finger injury.

3.    **ANALYSIS**

Defendants bring a motion for summary judgment seeking dismissal of both Eighth Amendment claims for: (1) deliberate inference to the serious risk of Plaintiff's self-harm; and (2) deliberate indifference to his serious medical need. ECF No. 48 at 1. Defendants recognize that some material issues of fact exist; however, argue that they are entitled to judgment as a matter of law when taking the facts in the light most favorable to Plaintiff. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motion for summary judgment on the federal claims, decline to exercise supplemental jurisdiction over the state-law negligence claim, and dismiss this case.

### 3.1    Deliberate Indifference to Serious Risk of Harm

The Eighth Amendment prohibits "cruel and unusual punishments" and "imposes a duty on prison officials to take reasonable measures to

guarantee an inmate's safety and to ensure that inmates receive adequate care." *Phillips v. Diedrick*, No. 18-C-56, 2019 WL 318403, at *2 (E.D. Wis. Jan. 24, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). While a prison official's deliberate indifference to a prisoner's substantial risk of serious harm violates the Eighth Amendment, not every claim by a prisoner that he did not receive adequate care will succeed. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

Prison staff have a duty to prevent inmates from causing serious harm to themselves. *Pittman ex rel. Hamilton v. Cnty, of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014). Before an official will be liable for ignoring a risk of self-harm, however, the "risk of future harm must be sure or very likely to give rise to sufficiently imminent dangers." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (internal quotation marks omitted). The question of when that risk of future harm becomes "sure or very likely to give rise to sufficiently imminent dangers" depends on the circumstances of the case. *See, e.g., Freeman v. Berge*, 441 F.3d 543, 546–47 (7th Cir. 2006) (explaining that "at some point," to ensure a prisoner is not "seriously endangering his health," prison officials would have a duty and right to step in and force a prisoner on a hunger strike to take nourishment); *see also Davis v. Gee*, No. 14-cv-617, 2017 WL 2880869, at *3–4 (W.D. Wis. July 6, 2017) (holding that to show a constitutional injury, the harm must present an objectively, sufficiently serious risk of serious damage to future health; swallowing a handful of Tylenol fails to do that).

In this case, the Court's analysis turns on whether the record supports that Jezwinski was subjectively aware of an imminent danger to Plaintiff's safety during their December 24, 2019 interaction. The Seventh

Circuit has held that a prisoner's statements that "he was 'hearing voices,' his 'father was taunting [him],' and he 'wanted to commit suicide'" were not sufficient to put prison officials on notice of the prisoner's intent to harm himself. *Johnson v. Garant*, 786 F. App'x 609 (7th Cir. 2019). In *Johnson*, officers recalled the prisoner asking "to see a [Crisis Intervention Team] member because he was feeling suicidal." *Id.* (internal quotation marks omitted). But no officer recalled the plaintiff stating that "he 'intended to immediately harm himself.'" *Id.* When officers ignored the plaintiff's statements, the plaintiff "attempted suicide by burning his arm with a roll of toilet paper that he set on fire." *Id.* The Seventh Circuit affirmed the district court's order granting summary judgment for the defendant–officers. *Id.* at 610. The court concluded that no reasonable jury could "find that the defendants knew of a substantial risk of suicide based only on [the plaintiff's] statements that he felt suicidal and wanted to speak to a crisis counselor." *Id.* The court reasoned that the plaintiff's statements provided no "indication that he may have 'imminently' sought to have harmed himself." *Id.* (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)). The court agreed with the district court that the plaintiff's statements "were insufficient to create a triable issue about whether the officers were subjectively aware of a substantial risk that the plaintiff would imminently attempt suicide." *Id.* at 611.

In its reasoning, the court in *Johnson* distinguished a similar case, finding deliberate indifference where a plaintiff wrote "a last will and testament," the plaintiff previously had attempted suicide and stopped eating, and the incarcerated prisoner's mother had called the prison to warn officials that her son was suicidal. *Id.* at 610 (discussing *Sanville v.*

*McCaughtry*, 266 F.3d 724, 737–38 (7th Cir. 2001)). The court found those additional facts, not present in *Johnson*, put the defendants in *Sanville* "on notice that the plaintiff's statement was not idle." *Id.* at 611.

Similarly, in *Williams v. Stacy*, another court in this district concluded that the prisoner's statement that "he was having suicidal thoughts" was insufficient to put prison officials on notice of a substantial risk of suicide. No. 18-C-1426, 2020 WL 6136148, at *2 (E.D. Wis. Oct. 19, 2020), appeal dismissed *sub nom. Williams v. Eckstein*, No. 20-3228, 2021 WL 1978369 (7th Cir. Feb. 2, 2021). The court noted that the presence of a sharpened pen in the prisoner's cell did not alert officials to a risk of harm, and no other evidence suggested that officials should have known the prisoner "had the means to harm himself or that the risk of future harm was sure or very likely." *Id.* (quoting *Johnson*, 786 F. App'x at 610).

Here, the Court finds this case to be similar to the previously mentioned cases where summary judgment was granted based on a finding that no imminent threat existed to a prisoner's safety. Taking the facts in the light most favorable to Plaintiff, after being upset about receiving bad meals, Plaintiff asked Jezwinski to see staff because he was going to harm himself. Jezwinski refused to get Plaintiff immediate help and Plaintiff covered his cell window. Jezwinski told Plaintiff to go ahead and walked away. Jezwinski returned to Plaintiff's cell four times but was not able to see inside the cell because of the window covering.

On these facts, the Court still finds that the record does not support a finding that Jezwinski subjectively knew Plaintiff faced an imminent risk to his safety prior to karate chopping his desk. To begin, none of Plaintiff's statements suggested that he imminently intended to harm himself.

Additionally, Plaintiff's vague statement about harming himself did not provide any information about a *serious* risk to Plaintiff's safety; this is inapposite to cases where plaintiffs have made specific threats about suicide or other serious injury. Jezwinski did not have any knowledge that Plaintiff had a razor or other instrument to harm himself, and Jezwinski did not have any information that Plaintiff had previously harmed himself. Further, Plaintiff's request came immediately after being angry about his food. Prison staff know that "prisoners may exaggerate or make things up to get attention or benefits." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "A guard who reasonably disbelieves a prisoner's assertion is not liable just because it turns out to have been true." *Id.* Further, Plaintiff admits that he covered his cell window and that Jezwinski could not have known what Plaintiff was doing inside his cell. The Court recognizes that the fact about Plaintiff's window covering could suggest that Jezwinski *should* have known Plaintiff was serious about his threat to harm himself. However, the question before the Court is not whether Jezwinski acted perfectly in this situation or even if he acted reasonably. Unreasonable conduct on its own does not give rise to liability under the Eighth Amendment. *See Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998) (deliberate indifference "is more than negligence and approaches intentional wrongdoing.").

In sum the undisputed facts before the Court do not support a finding that Defendant Jezwinski was subjectively aware that Plaintiff faced an imminent risk of serious harm. As such, the Court finds that no reasonable jury could find that Defendant Jezwinski was deliberately indifferent to Plaintiff's serious risk of self-harm. Thus, the Court will

accordingly grant Jezwinski's motion for summary judgment on this Eighth Amendment claim.

### 3.2 Deliberate Indifference to a Serious Medical Need

Plaintiff proceeds on an Eighth Amendment deliberate indifference claim against Defendants Gaanan, Loria, and Mitchell for their alleged indifference to his serious need for treatment of his pinky finger injury. Each defendant's involvement with Plaintiff's medical care differed greatly, so the Court will address each defendant's culpability separately below.

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On

the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662. The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is

Page 17 of 27

effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties,* 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

To begin its analysis, Defendants do not argue that Plaintiff did not have an objectively serious medical need. ECF No. 48. As such, for the purposes of this Order the Court will assume, without definitively ruling,

that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard.

Instead, Defendants argue that they were not deliberately indifferent to Plaintiff's medical needs. First, the Court will grant summary judgment as to Defendant Gaanan. The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon*, 163 F.3d at 988). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson*, 433 F.3d at 1013. Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe*, 631 F.3d at 857; *Sain*, 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya*, 836 F.3d at 805 (emphasis in original).

Here, Plaintiff saw Gannan for treatment related to his finger only once very shortly after the injury occurred. Gaanan reviewed Plaintiff's X-ray and made a treatment plan accordingly. Based on his opinion of the X-ray, Gaanan believed conservative treatment was warranted and provided pain mediation and taping of Plaintiff's finger. Although Plaintiff disagreed with the treatment he received and its effectiveness, this is insufficient to meet the high burden of deliberate indifference. Plaintiff has provided no evidence to show that no minimally competent professional would have so responded under those circumstances.'" *See Sain,* 512 F.3d at 894–95. Even if Plaintiff is correct that Gaanan misdiagnosed his injury, negligence is insufficient to meet the high deliberate indifference standard. As such, the Court will grant summary judgment with respect to the Eighth Amendment claim against Gaanan.

Second, the Court will grant summary judgment for Defendant Loria. Loria saw Plaintiff only two times for his finger injury and referred him to a specialist after the second visit. The Court views Loria's actions in two different categories: (1) her decisions regarding Plaintiff's pain management for his injury; and (2) her decision to pursue conservative treatment and the resulting delay in referring Plaintiff to a specialist.

The Court does not find that Loria's actions regarding Plaintiff's pain management rise to the level of a constitutional violation. The Eighth Amendment requires "medical officials who know that an incarcerated patient is suffering to take 'reasonable measures' to alleviate that pain." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citing *Arnett,* 658 F.3d at 753–754). However, it does not "entitle incarcerated patients to their preferred pain medication, nor does it impose the

unrealistic requirement that doctors keep patients completely pain-free."
*Id.* (citing *Arnett*, 658 F.3d at 754; *Snipes*, 95 F.3d at 592). To survive summary
judgment, a plaintiff must provide evidence that would allow a reasonable
jury to conclude that the defendant was deliberately indifferent to his pain.
*Id.* Such evidence may include that "defendants 'persist[ed] in a course of
treatment known to be ineffective" or that "defendants' recommended
course of treatment was 'so far afield of accepted professional standards as
to raise the inference that it was not actually based on a medical judgment.'"
*Id.* (citing *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020); *Arnett*,
658 F.3d at 75).

Here, the record does not support a finding that Loria was
deliberately indifferent to Plaintiff's pain. During their first visit on January
30, 2020, Loria advised Plaintiff to continue taking his Ibuprofen as needed
for pain. Plaintiff's version of the facts is that he told Loria that the pain
medication did not stop the pain completely; however, nothing in the
record shows the prescribed Ibuprofen did not help the pain at all. *See* ECF
No. 62 at 12. Nothing in the record indicates that Plaintiff sought a change
in pain management from Loria in between his January and July visits.
When Loria saw Plaintiff in July 2020, he had switched medication and was
taking Tylenol to manage his pain. Again, on Plaintiff's version of the facts,
he told Loria that the medication did not stop the pain completely; he did
not indicate that it was not helping at all or request alternative pain
treatment. On these facts, the Court cannot say that Loria persisted in
treatment that she knew to be ineffective. While Loria was aware that
Plaintiff's pain was not completely alleviated, the Eighth Amendment does
not require doctors to keep patients completely pain free. As the Seventh

Circuit has articulated, "[t]here are many reasons for doctors to tread carefully when prescribing strong pain medications." *Arce*, 75 F.4th at 681. In short, the Court finds the record lacks evidence that would permit a jury to conclude that Loria's response to Plaintiff's pain was so "blatantly inappropriate" that it demonstrated deliberate indifference. *See Pyles*, 771 F.3d at 409.

Next, the Court addresses Loria's actions regarding Plaintiff's need to see a specialist for his injury. In addressing a delay in medical care, a plaintiff must show that the defendant caused the delay through his actions or inaction. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019*) (citing Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005)). In *Walker*, the Seventh Circuit considered whether a doctor was deliberately indifferent for not immediately referring the plaintiff, an inmate in the custody of IDOC, to an outside medical facility to assess his difficulties in recovering from spinal surgery. *See id.* at 957–59. In that case, the doctor first examined the plaintiff in late September, approximately eighteen months after the spinal surgery, and noted that the plaintiff showed signs of upper motor neuron syndrome. Instead of immediately referring the plaintiff for a neurosurgery consultation, the doctor ordered X-rays, prescribed muscle relaxers and anti-inflammatory medication, and noted that he would make a referral after receiving the plaintiff's blood test results. *Id.* at 958. He made the referral, which was approved in early December that same year. *Id.* However, the facility did not schedule a neurology appointment until late April the next year. *Id.* The court held that the doctor was not deliberately indifferent due to the delay in the plaintiff's care. *Id.* at 965. The court reasoned that although "an immediate referral

would have been beneficial," the doctor "made a reasonable medical judgement to delay referring [the plaintiff] until he had more information so that he could make a more informed referral request." *Id.* Further, the Court explained that, despite the clear delays in the plaintiff's treatment, the doctor "did what he could within the limits of his role to move the ball forward" and could not be blamed for scheduling delays outside of his control. *Id.* at 966.

Here, the record does not support a finding that Loria's delay in referring Plaintiff to a specialist rose to the level of deliberate indifference. Plaintiff relies heavily on a progress note from an October 15, 2021 visit with another physician. The note states "xrays from Jan 2021 showed radial deformity of left small DIP with degenerative changes." ECF No. 65-1 at 20). Plaintiff also relies on a December 22, 2021 progress note that indicated he "did not undergo extension splinting" following his initial injury. *See* ECF No. 65-1 at 44. This evidence, however, is not the smoking gun evidence Plaintiff believes it to be. Plaintiff believes these medical notes show that a delay in a referral to a specialist exacerbated his injury; however, the Court disagrees. The October 15, 2021 progress note refers to X-rays taken more than a year after the December 2019 X-ray relied on by Gaanan and Loria. This note did not make any statement about or contain any opinion that the delay exacerbated his injury or prolonged his pain. *See Petties*, 836 F.3d at 730–31. As to the December 22, 2021 note, merely noting that Plaintiff did not go undergo extension splinting is not the same as opining that Plaintiff *needed* to undergo splinting at that time. Plaintiff's evidence does not prove that Loria misdiagnosed Plaintiff's injury and should have instead provided extension splinting. Moreover, even if this

evidence did prove that Loria's initial conservative treatment was wrong and that she misdiagnosed him, this would still be insufficient to meet the high deliberate indifference standard.

Additionally, the record does not support a finding that Loria was personally responsible for the long delay after their July 2020 visit. Loria's handwritten note shows a referral to a specialist and Plaintiff was transferred to another institution just over a month later when he was no longer under the care of Loria. Nothing in the record indicates Loria was aware of Plaintiff's delay in treatment. The Court does not deny that Plaintiff's wait to see a specialist appears extremely long; however, the majority of the lengthy wait cannot be attributed to Loria's actions. Similar to Gaanan, the Court finds that Plaintiff has not provided evidence to show that no minimally competent professional would have responded to Plaintiff's injury differently than Loria did. As such, the Court will grant summary judgment with respect to the Eighth Amendment claim against Loria.

Finally, the Court will grant summary judgment as to Defendant Mitchell. The undisputed facts establish that Mitchell was not personally involved in Plaintiff's care, and that in her role, she could not override treatment and medication decisions of Plaintiff's doctors. Plaintiff saw a doctor the day after he directed an HSU to Mitchell. Moreover, as the Court concluded above, Plaintiff received ongoing medical treatment and Gaanan's and Loria's treatment decisions did not rise to the level of deliberate indifference. As such, even assuming Mitchell could have overridden their decisions, Mitchell's deference to the doctors' decisions would similarly not amount to deliberate indifference. Nothing in the

record suggests that no competent medical professional would have responded differently than Mitchell did. As such, the Court finds that no reasonable jury could find that Mitchell was deliberately indifferent to Plaintiff's serious medical needs.

In sum, the Court finds that no reasonable juror could find that Gaanan, Loria, or Mitchell were deliberately indifferent to Plaintif's serious medical needs. The Court will accordingly grant Defendants' motion for summary judgment on the Eighth Amendment medical claim.[3]

### 3.3 State-Law Negligence

As noted above, Plaintiff has alleged a state-law negligence claim against Defendants, the intricacies of which need not be elaborated on because the Court declines to exercise supplemental jurisdiction over that claim. *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). As such, the Court relinquishes jurisdiction over Plaintiff's state-law claim, which will be dismissed without prejudice.

### 4. CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment as to the Eighth Amendment claims and dismisses these claims with prejudice. Additionally, the Court declines to

---

[3] Defendants also moved for summary judgment based on qualified immunity. ECF No. 48 at 12. Because the Court grants summary judgment on the merits and finds no deliberate indifference based on the undisputed facts, the Court need not reach the question of qualified immunity.

exercise supplemental jurisdiction over Plaintiff's state-law negligence claim and thus will dismiss that claim without prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 47, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's Eighth Amendment deliberate-indifference claims be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the state-law negligence claim and the state-law negligence claim be and the same is hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2025.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.